Good morning, your honors. The police court. I'm Jim Quadron. I represent the plaintiff appellate in this matter with me is my partner, Rebecca Call. Your honors, on December 12, 2013, Amy Lamberth, who was just turned 13 years old, took her own life. In the note she left her parents, she stated as follows, I only asked that you tell my school I killed myself, so maybe the next time people like CH wants to call someone pimple face or emo ass bitch, he won't. Haley's note is the most compelling evidence that the Clark County School District failed Haley and took actions related to her bullying that led to her tragic death. It's also that note the first time her parents discovered she had been bullied at school because the school district failed to inform them in violation of state law. It was the first time they heard that their daughter had endured a year, months of tormented school where she was called a fat ass, a bitch, and statements like, I hope you die, Jim. Mr. Quadron, this is a very tragic case, and my heart goes out to the family, but how can you distinguish this case from the Supreme Court's decision in Duchenne versus the Winnebago County Department of Social Services, which involved the facts that were just as horrific? Your Honor, I'm happy to answer the question. The one thing that I do want to point out is that we believe that, in fact, the right to merely compel was also, I mean, and then the complaint was also violated. Also, Your Honor, I forgot, in MA, I want to reserve three minutes, so. Yes. I believe that Duchenne is a completely different situation because in our situation, when you look at the state-created doctrine, you don't have the situation you have here, and it may be novel. We were unable to find a case on the point where you have a state statute that compels conduct by the school district. What was there? Weren't there state statutes for the protection of children in Wisconsin or whatever state that was that gave duties to the Department of Social Services to assist or deal with abused children? I believe, Your Honor, that there were general statements as to how they should conduct their business, but there was no finding in that case that an actual law had been violated, nor was there an allegation, I believe. On a point like this where there is a failure to protect is not, it's the same legal theory here as was present in Duchenne, and I'm trying to try and figure out how to legitimately distinguish your case from Duchenne. Right. Well, there are others, Your Honor, but I just want to point out that I think the court is facing a novel issue, which is when you have a specific statute, as you do in Nevada, that says, you shall report this to the parents for the protection of the children, and the school makes a decision to ignore that. That is an action under the state-created painting. But it's a failure to act, and what you're asking us to do is to equate the failure to act with an intentional action. Well, Your Honor. And that was the same theory that was argued to the Supreme Court in Duchenne, and the court said there was no constitutional obligation. Again, on Duchenne, I think the decision was based on not a ministerial act as here, where it's just a reporting requirement as opposed to a decision-making as to whether the conditions were attained. Duchenne, the social workers had actually gone to the home on multiple occasions and actually removed the young child based on abuse reported by the hospital, and then affirmatively returned the child to the deceased parent, who then did horrible things. Correct. Well, I mean, as I say, I think that case involves even worse facts than this one here, and yet the Supreme Court said that is not a cause of action against the state. Well, again, the Supreme Court looked at the issue of whether that was an affirmative act, opposition, and again, I'll move on to the rest of why Duchenne is offended, is that ignoring a state-mandated rule that requires ministerial act, not decision-making on their part. It must be done. It's a failure of the actual cause of deeds and action under the state-created danger doctrine. However— What else besides that? That's right. That's not a situation. So, in this case, the facts are different. There is actual evidence that are taken. There was a bullying report. Under the law in Nevada, they are supposed to investigate that bullying report. They failed to do that adequately. Once again, a failure to act. Well, it's a failure to act. They didn't do something else. They didn't. They did it poorly. They actually conducted the investigation. So, the failure to do whatever it is you say they were obligated to do. I'm talking about perhaps that Duchenne made Haley more vulnerable, right? What they then did was impose minimal discipline on the bully. And they took an action to impose minimal discipline. And basically telling Haley that the complaints about her bullying and being harassed every day were basically insignificant to the school, despite its policies, and specifically showed that by the action of imposing minimal discipline and sending Haley back into the school without any indication that the school would protect her, even though they had promised to do so. Mr. Counsel, I think Secretary Blanford has articulated the affirmative action from the state-created danger exception imposes a test as to whether or not whatever it was that the official did did it place Haley in a worse situation than she would have been in had school officials done nothing. How is that testament on this record? Well, again, if you have a child, then it's promised that they will be protected at school by the school districts on policies that are enumerated to the kids. And then that policy is taken lightly by the school, and minimal action is taken to protect her. The effect is to create a despondency in that child, who then writes a note of basic teacher licenses the school should learn from this. Because with Haley, they did nothing. So is your theory that what the state did here was somehow a proximate cause of her despondency that resulted in suicide? Well, the school and its conduct led to her suicide. In fact, the school has a policy that says that bullying is a means to suicide. Is there any evidence in the record that any school official knew that Haley was exhibiting suicidal ideations? There was a testimony by school officials that they believed, at least one of them, they believed that if the parents had been informed of the bullying, that Haley would decline. That's my question. But I asked you your question. That's my question. Do you understand the question? Right. So I do not know. I think that the record reflects that they were aware of suicidal ideation. But I am aware that the policies that protect against bullying indicate that suicide is likely our potential cause. In fact, that's a policy at the school that was given to us in this case and provided in the state after my case. Does the failure on the part of the school official to act essentially maintain the status quo, which was she was still susceptible to bullying? How did the state create an enhanced danger behind what she was already exposed to? Well, again, if you intervene, which they did, and do it poorly, and then take actions that signal to the child that the school administration is not any way that she's going to be protected and she is placed back in the environment, the bullying will continue untethered. Isn't that what happened in Deshanie? I mean, the social workers returned the child after there had been multiple occasions to the custody of the abuser, but then continued the pattern of abuse. That child was 4 years old. The kid was 13. You're looking at what the school did affect her. Would it have made a difference in Deshanie if the child was 8 years old or 10 years old? I think that if the child had been older and written a note that said that the state had failed them because they took actions that were improper, we would have a way of looking at what the net effect of that conduct is. But with a 4-year-old, which is maybe not even aware of what the duties of the state are, it's completely different than when a 13-year-old is fully aware of the policy of the school and that the school takes minimal action to protect her. So the policy of the law being even higher is to protect a more vulnerable younger victim than an older victim under your theory? Well, Your Honor, I don't disagree that Deshanie is wrong, and that's my policy. I understand, but Deshanie deals with the specific facts that involve 4-year-olds. If you look at this case, on their mental capacity to understand that conduct is minimal action by the state, and that creates... Well, I actually think, Your Honor, that if you looked at the cases that were cited for the purpose of state-created danger, which were Henry Day, V. Wilden, Armijo, which is from the Tesseract, and Kennedy v. Rizzo, I think they stand for the proposition that when you look at what an action is, it can take various forms. And for example, in Kennedy, it involved the police advising a person that they were going to inform her when the accuser was confronted. Failure to do so led to the killer killing the neighbor. So you can have situations in which the action itself is looked at differently than saying just a clear affirmative act that involves, I think, brains. When you look at these cases, here you have medical... Basically, the bully getting a slap in the hand, a constant obsession, knowing how to inform the parents. So then what you have is, Haley knowing that if she reports bullying, nothing will be done. And she goes back into that school system, gets bullied more, commits suicide, and then tells the world. But in Kennedy, there was also a promise made, was there not, that we'll give you extra school district schools in your neighborhood, and that didn't happen either. But in Kennedy, was the killer's danger exacerbated by the officer who had promised to notify the victim family if he contacted the subject, and then he did in fact contact the subject, which apparently set the subject into a rage, and he never told the family that he'd done that? That's affirmative conduct, is it not? That increases the danger to, in that case, the victim. So what would be analogous here is they took a position, they took an act, and here it wasn't talking to the accused, it was talking to... I'm sorry, it was talking to the same thing, it was talking to the accused, but then doing nothing about it, really, other than your counseling and sending her back, and then pretending to inform the parents. So if you talk about an identity where you have, we're going to warn you, and then you don't warn, that's exactly the situation here, which exacerbates the situation, because you have your child understanding that the policies of school are not going to be followed, and that they're not going to be protecting her because they took an action that demonstrated that to her and caused her to then be discharged. We wanted that same agreement. Thank you. Thank you. Good morning, Your Honor. May it please the Court? May it please the Court. The Clerk and the District Defendants. This certainly is a tragic case, and our hearts go out to the Amherst, but all of these cases are tragic. This Court pointed that out, and I tell Justice Rehnquist pointed that out in the shading, but just because there is a terrible situation doesn't mean that there is a constitutional remedy as opposed to a state law remedy. And let's look at where we're drilling down on the exception. What is the status of the Clark County District Court? The trial has just continued. The trial is going to take place in August. Okay, so the case is proceeding forward. It is. Okay. Very much so. We're drilling down on the exception, but let's remember the general rule to which we had this exception, that is that a substantive due process claim can be brought against the government for the government's actions. Now, there are a few exceptions to that, and we're dealing with the exception where the state actually creates the danger. Well, that's not what our case is about. It's also down to itself creating the danger. It can be an existing danger to the state. Nice. I agree. That makes the situation worse, right? Yes. So here, I thought that we had some very good steps. I think that beyond just failing to intervene when the state should have looked to do something about it, so it's at least a little bit apparent. The reason the state made it far more worse is because I think there were some sort of deems, which in the end, the deem made you aware that, yes, the school knew about this harassment that was going on. And then, you know, in combination with the training she had received, which suggested that if the harassment were serious, the school would do something. When the school did notice, that's when you said, well, I guess there's no way out. Well, and that's a new theory. That wasn't argued in the district court, and I'm not sure it was in the opening brief. It seems to be more, and that was Judge Tallman's question to Plattus, is the argument that the school district caused her despondency. And I don't think that that's what this case has been about. And actually, what they allege, and I'm trying to carve out what we know from discovery and what's in the report of bullying, that one dean met with Haley, and one dean met with JJ. They talked to them, and it's clear from both the exhibits, the opposition to the motions from retrenchment, and the opposition to the motion in the end, that there was no problem between those students ever again after that. And the school district was not aware of any other bullying having to do with Haley until after her death. And I've got an online report that was sent to the dean involved, not JJ, but other students. No, that was JJ. CJ did an online report involving Haley's encounter. She put it in a plural, but there's nothing said that there actually was, besides that and subsequent reports, that there was more than one encounter in PE class. I'm not sure it makes a difference which student in the city who felt victimized by both the students who were around CJ. But the school district did not know about CJ at all. Well, it could be that, but I don't know what it is in CJ. It does matter. Just to offer to explain why I think it matters. Because their theory is that we created some kind of environment where Haley had an expectation that something more would be done. We would have to know that there was something in the first place. Right. So I'm not disputing that one of these students did learn about it. It's one of the students that are asking it, right? There's no dispute that we all knew about her encounter with JJ. One dean met with Haley. One dean met with JJ, investigated. There's no dispute whether that's an investigation, but they were both interviewed about what happened, and nothing ever happened between those two students after that. So there was action taken. I would contend, based on the record that we have in front of this board, that there was adequate action taken. But I also disagree with, and I realize that you're saying that that's their best argument, but I don't think that action and the failure to move forward constitutes something that would fall under the state-created danger exception. And that's what we call it, and I understand. It doesn't have to depend on us creating the danger, but we do have to at least do three things under the state-created danger exception. We have to take affirmative action. That action has to result in harm that is greater than the status quo, and we have to do that with deliberate indifference. So a lot of the opinions put those as two factors, I think, to descend from the Rehering and Bank, and Kennedy puts it as three factors. And certainly it's important that we look at the second one either as part of the first factor or by itself, because I don't think we need any of those factors here. The failure to go further, the failure to intervene further, the failure even to keep promises is not enough to be either affirmative action or affirmative action that causes greater danger. Let me ask you this, and you'll dispute that these are the facts in this case, but let's say that a meeting with the team resulted in communication against the syllabus. We're aware of all the harassment by all the students that you're employing. We will take care of it. You have your back. This is going to be seen. This is not taught. We're going to fix this. And so their interaction works against them. So it's harassment. It's not accepted. So I think there's nothing that's going to be done about this. And for two different reasons, first of all, just making a promise is not enough. This court in Patel distinguished Kennedy by saying, okay, promises are being made, although there were promises being made in Kennedy, and we found as they created danger, that wasn't the extent of the situation. In Patel, there were promises. That wasn't enough to create a crime evasion case. It created danger. And in Kennedy, there was so much more than the promise. It wasn't just that the police promised to send patrol cars that night. It was that they had said to the family, we're not going to tell your neighbor that you reported the 13-year-old molester. And then they did tell. But Kennedy just said, well, we'll let you know before we do that. And that's the second thing. They said, we'll let you know. And they didn't let them know. So they created the danger. The police officers created the danger to the neighbors. So I'm saying with a 13-year-old, you all know how hard with 13-year-olds are to kind of grasp what the family was doing, that it might be for the kids. That state makes things worse. Existing harassment is bad enough. The police didn't create that. But you might make that situation worse from the student's standpoint. Because the school says, we're aware of this, and basically communicates the interaction. Unless we're not going to do anything about it, that could add an additional layer of despondency and hopelessness that might move a 13-year-old from just being very unhappy to actually taking their vows. Well, and they quoted one of my deans who said that this could have resulted in the suicide. And all she said when she said that was, well, could have. I don't think could have is enough. And that's why earlier when I was talking about your hypothetical, I said two reasons. The second reason is that the causation here, the foreseeability here of the suicide is so much more remote. Yes, we're dealing with 13-year-olds. And, Your Honor, my clients deal with 13-year-olds every day. And you cannot say that this would be a foreseeable risk, enough to be a known or obvious danger either for the third prong, or enough to say that they were sending Hidley into a dangerous situation just by letting her leave the dean's office. You keep saying we sent her back into the classroom, but there's no proof that the classroom was the place of the harm. It's not like the Kennedy case where the cover on our actors there actually caused the situation to be worse. It was the same JJ who was in the classroom. Well, the other CD class, but that was never a problem again. I know that. I'm sure you are. Yes. Can I ask you about the telemining claim? I know it was added late. But finally. Yes. Okay. Well, maybe you can address why is it one of the key forwards to dealing with the telemining claim? Well, what Judge Gordon did in dealing with the motion to amend, remember the plaintiffs were going only on a substantive due process claim. And after that was dismissed, 106 days after the deadline to move to amend, they added a Title IX claim, an ADA claim, an IDEA claim, a procedural due process claim, some equal protection claims, and there's another one I'm forgetting. And Judge Gordon said, well, no, there are four reasons you can deny a motion to amend. It's in bad faith, it's dilatory, it's futile, and it causes prejudice. And the judge found, A, that the amendments were futile to say their substantive due process claim. Can I ask you about the Title IX? Yes. And B, that they were too late. It caused prejudice to us. And his discovery was closed. As for B, they say that they did not honor the facts that supported the Title IX decree. Maybe still after, you know, the original complaint had been filed, the motion had been dismissed and the change was understood. And Judge Gordon flatly rejected that. He said there's no newly discovered evidence. They don't come forward with what evidence is the basis of all their new claims. And they don't come forward with the reason why it's newly discovered. And he specifically found it would prejudice us to have to do discovery on those claims. Did he also find intentional delay on the part of the plaintiffs that came in before the deadline? He said it was a, yes, all the new claims, he also said it was a tactical, I think he may have said, strategic decision to bring in these claims after the other claims had been dismissed. Because they had said in their reply brief the motion to amend that there was no reason to bring all these claims earlier. And so he took that as a admission that it was a purposeful and strategic decision. If the court has no other questions. Judge Gould, do you have any questions? No questions. Thank you. Thank you, counsel. Counsel, I think you have two minutes and 43 seconds. 30 seconds, I'm sorry. Thank you, Your Honor. Just quickly on the motion to amend the complaint. One point that is not raised by counsel is the fact that in upvoting the motion to dismiss, in that motion, in our opposition to be asked to leave to amend, that was before any cutoff was in place. That was before any data had passed. We asked the court in hearing a client to dismiss our case. We want to be able to amend. The other notion is that after we have fully briefed the papers, and we believe that our pleading is sufficient, to somehow require us, after having asked to leave to amend, to come back and say to the court, please let us file another unamended complaint. Counsel, as I understood what Judge Gordon was concerned about, he said that he was on a case management schedule, which included deadlines for filing a summary judgment motion, and you're almost saying I wanted to see how he ruled on the summary judgment motion before I decide whether or not I'm going to amend my complaint. No, it wasn't a summary judgment motion, Your Honor. He said deadlines. There was summary judgment deadlines, but that wasn't one. And then he made specific findings that after that schedule was put in place, that you were not able to give sufficient cause for why you waited as long as you did to request the amendment. So no cause, and that you intentionally delayed. So what do we do with that? Because he waited six months to rule, so he deferred to the court because they were considering our opposition. You knew you had the claim. Why didn't you simply file a motion to amend? Well, we thought because the attack was on the state grade endangerment, we believe we had properly planned it, but nonetheless, Your Honor, even if that was the standard, under Rule 16, we took 15 depositions. We put additional evidence in, and we clearly had good cause, and what the judge did is treat it as a motion for summary judgment, wanting us to present all that evidence out of state. And I know I'm going to run out of time, but I will say that counsel was incorrect, state that the argument that Casey responded because of the problem is actually in our proposed amendment complaint, and it's also in our opening brief. The proposed amendment? The proposed amendment complaint from which we appealed the denial of, and also in our opening brief at page 7. How is that before Judge Gordon if you didn't make the amendment and provided a copy of the complaint? We made a motion. We provided a copy of the complaint. We put it in there. He denied that. We appealed. To say it's a new theory is incorrect. It's in page 7 to 8, 21 to 23, 32 to 33 of our opening papers here. I don't know. I didn't just use it here. I think I just put it in there. But can I ask you just one question? I know you're over your time, but I'm just totally up to your house. I don't think that that was the issue that people put. Why are you not content with seemingly very strong state law claims that you could pursue under state tort laws? Is there some kind of immunity that is of your faith? There are caps that are put under the battle law that are not in 1983 cases. I think you received some changes to dynamics of the cases. So no one's been allowed to attorney's fees, is there? I think that would be the case. Okay. Thank you, Your Honor. The case has already been submitted. We'll get you an answer as soon as we can. The next case for argument is United States v. the County of Maricopa. Number 15-17. Fine by me.
judges: Gould, Tallman, Watford